HERMINA HALLETT HYMAN v. WARREN S. HYMAN

6 So. (2nd) 535                                    Division B
February 24, 1942          Rehearing Denied March 16, 1942

Botts & Field, for appellant.

Ward & Ward, G. Earnest Jones (Birmingham, Alabama) and Roderick Beddow, (Birmingham, Alabama), for appellee.

CHAPMAN, J.:

This is an appeal from a decree of divorce entered by the Circuit Court of Dade County, Florida. Mrs. Hermina Hallett Hyman filed a suit for alimony, unconnected with a divorce, and a decree in her behalf was entered. The lower court subsequently granted a motion to vacate the alimony order and permitted Warren S. Hyman to file a bill for divorce against Mrs. Hermina Hallett Hyman, his wife. She filed an answer, when an order of reference was made, testimony taken, and a recommendation of the master made; and the chancellor on final hearing confirmed the master's report and entered a divorce against the wife on the grounds of extreme cruelty and ungovernable temper.

The appellant wife applied to the chancellor for an order permitting a re-opening of the case and sought an order allowing the filing of an amended bill of complaint by the wife against the husband, and each being denied, an appeal has been perfected therefrom and the final decree, the order denying the motion to re-open the case, and order denying leave to file an amended bill are each here challenged as constituting reversible error.

These several questions were addressed to the sound judicial discretion of the chancellor and it becomes necessary to review each of the adverse orders on the merits appearing in the record.

The record discloses that Hermina Hallett Hyman was reared in Minnesota, attended the public schools of that State, and graduated at the University of Minnesota with a degree of Bachelor of Arts and Sciences. She subsequently taught school for two winters in the State of Iowa and afterwards took post graduate work at the University of Southern California. She inherited from her parents a tidy sum, and for some time prior to her marriage with appellee lived with her mother at Miami Beach, Florida. Her mother's death occurred in 1936. She was an athletic type and participated in many of the social and winter sports at the beach. The opportunities of acquainting herself with the traditions of the South and southern people were meager and limited, although she resided at Miami Beach two or three years prior to her marriage to a southerner. She was of the Catholic faith.

The appellee, Warren S. Hyman, was born, reared and grew to manhood in central Georgia, and after his father's death supported his widowed mother. He had a brother and sister. His mother owned a farm

but it did not yield a large income. The son was educated in the common schools of Georgia. He came up under conditions referred to as "the hard way" and early in life obtained employment and worked with a railway company. He was efficient and loyal and his promotion was rapid. His activities and employment were confined exclusively to the South. Winter duties to his company were assigned him at Miami and during the summer similar duties at Asheville, North Carolina, and environs. His salary was $250.00 per month at the time of marriage. His family were Baptists. The appellee was without definite knowledge of the customs, habits and traditions of the people of Minnesota, surrounding the birth, background and atmosphere in which his wife grew to womanhood.

The evidence discloses that the appellant was in her late thirties, while the appellee was in his early forties. Neither had been previously married. There was an acquaintance of the parties; an occasional association developed into a friendship, thence an intensive courtship of approximately eighteen months, and the existence of deep affection resulted in marriage on June 25, 1938, at Miami, Florida. It is indisputable that the parties possessed distinct and conflicting views and differences on religion, education, habits, standards, concepts and cultural backgrounds. Additional to these apparent insuperable barriers there existed a prenuptial agreement that appellee's mother, then more than three score and ten years old, should become a member of the family in the home established by the parties. For several weeks after marriage the parties lived in Asheville, North Carolina, and in the fall started housekeeping

at Miami. The appellant became the housekeeper, while the husband was the provider.

The mother became a member of the family in November of that year. She had no other place to go. One son residing in South Carolina was unable to provide a home for her, while her only daughter resided in Texas and was struggling to support her children and a preacher husband. Counsel for appellant points out that from the date that appellee's mother entered the home, it was clear from that moment the marriage would prove a failure, and that the mother was an indispensable party to this litigation. On January 7, 1939, approximately two and one-half months after the arrival of appellee's mother in the home, appellant, with tears, announced to her husband that she could not further tolerate their domestic relations and that their marriage was a failure. She left their home on January 19, 1939, and immediately the mother-in-law returned to Georgia.

The wife was the housekeeper and supervised the preparation of all meals. The mother-in-law had for many years kept house and had fixed views on the management of a home. The husband was raised on Southern cooking and Northern cooking interfered with his digestion. He liked hot biscuit and corn bread at each meal, and light bread and crackers were not on the Georgia menu. Likewise, he was fond of a dessert after each meal, but the family budget was continuously out of balance. The gastronomic pleasures of Southern people were discussed and the words "glutton," "buttinsky" and "sanctified hypocrite" were applied to the mother-in-law. Appellant denied the use of profanity, but admitted an affection for the word "damn." The parties were fond of cocktails,

but the mother-in-law called them the "Devil's water." The appellant wanted to keep her Collie dog in the apartment, but appellee thought the yard the better place for it. When appellee's food gave out at the table he would yell to the cook to bring him more. This was a faux pas and contrary to the holdings of Emily Post. Appellant suggested the correct manner was to speak to her and she in turn would relay the request to the cook, and the food would immediately be served. Appellee contended that appellant's cooking was killing him, but she pointed out that he had gained twenty pounds under her administration.

When attending a dance appellant paid the orchestra leader to play her favorite number but he failed so to do. She became angry and remarked at the moment she really needed a "man," but appellee was not interested as the orchestra was made up of strong, healthy, young men. The mother suggested that on Sunday all should attend church and remarked to the parties when they were going out for the evening before, "Don't stay out late or drink too much," when appellant replied, "I will get as drunk as I can and stay out all night if I like and if husband doesn't like it he can go home." The appellant arranged a cocktail party at her home conflicting with the mother-in-law's attendance of a pageant at the Baptist Church, and a quarrel followed and while appellee listened to the dispute between the mother and his wife, the latter angrily threw her wedding ring in the appellee's face causing an abrasion. The appellant was loyal to the Catholic faith, while appellee and his mother worshipped with the Baptists.

Pressure in the home was such the appellant frequently unescorted at night drove around the City of

Miami in a car for the purpose of relieving the tension at home and collecting herself. Shortly prior to the separation in January, 1939, the parties resorted to violence. Chancellor Williams, below, in his opinion employed the language viz:

"Probably plaintiff and defendant should never have married as they were ill-suited, inadjustable, and incompatible for marriage to each other, plaintiff being of the emotional, highstrung, fun-loving, lively, vivacious, happy-go-lucky, carefree, restrainless, pleasure-bent, type of lady, thirty-eight years of age, who was accustomed to the free use of plenty of money and no barriers, while defendant was of the serious, plodding, static, hardworking, one-position, home-loving and stay around the hearth type, and forty years of age. . . .

"That about four months after their marriage and after defendant had brought his mother to live in the home with them, in accordance with their pre-nuptial understanding and agreement, the freshness, newness, novelty, and ecstacy of married life to plaintiff departed from her and the marriage became prosaic, drab, dull, irritating, disagreeable, burdensome, and colorless to her and she commenced to compensate for that with a vengeance by drinking whiskey heavily, acting cool, indifferent, and sour toward defendant, carrying a smirk on her face, looking displeased, snubbing him, carrying an upset countenance, finding fault with him, carping, ridiculing, taunting, and insulting him, and acting generally petulant and disagreeable toward him, aggravating, annoying, nagging, irritating and torturing him daily for two months before she finally, in a wild frenzy, un-

controllable huff and rage, separated from defendant without a sound reason January 7, 1939."

The amended bill has been considered. The several matters sought to be established by appellant if the case is reopened are set out in the brief and ably presented by counsel for appellant at the bar of this Court. We have carefully weighed these several matters. Permanent alimony to appellant could or may be decree on such a re-opening and final hearing. We are confronted here with the property holdings of the appellee, being his salary in the sum of $250.00 per month, and his aged mother as a dependant. The latter owns a farm in Georgia, but the income is inadequate to support her. It is shown that the appellant owns property, is an experienced teacher; no children were born to the marriage, and she was in general good health. We do not feel justified in substituting our views for those of the chancellor below. The burden was on the appellant to show reversible error, but she has failed so to do. The case has been exhaustively briefed and well presented. Sorrow, bitterness and remorse logically follow an unwise marriage, which are accentuated frequently by stubbornly contested litigation.

The decree appealed from is hereby affirmed.

BROWN, C. J., TERRELL, and THOMAS, JJ., concur.